UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STAG INDUSTRIAL HOLDINGS, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>SOLAR SEAL LLC, SOLAR SEAL LLC, )<br>NAVERRA GLASS LLC, and O3 )<br>INDUSTRIES LLC )<br><br>Defendants. )<br> )<br> ) | Case No. 1:23-cv-11726-ADB |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Defendants Solar Seal LLC ("Solar Seal DE"), Solar Seal LLC ("Solar Seal MA"),

Naverra Glass LLC ("Naverra Glass"), and O3 Industries LLC ("O3 Industries") move for

summary judgment on Counts II and III of Plaintiff STAG Industrial Holdings LLC's ("STAG")

Amended Complaint.  STAG's Count I is for breach of contract against Solar Seal DE and Solar

Seal MA for failure to pay on a commercial industrial lease.[1] STAG amended as of right to add

Count II, seeking successor liability against Naverra Glass, and Count III, against O3 Industries

on a veil-piercing theory.  The Amended Complaint's grand allegation was that O3 quarterbacked

the transportation of Solar Seal DE's manufacturing equipment to Naverra Glass's factory in

Norwich, Connecticut, and that Solar Seal DE relocated its business there as Naverra Glass.

---

[1] STAG's Amended Complaint, after naming Solar Seal DE and Solar Seal MA as two
Defendants, collapses them into a singular entity it calls "Solar Seal."  Although handy as a
naming convention, the reduction of two parties to one does not aid in analysis of the claims
filed.  For clarity's sake, this memorandum generally refers to the two Defendants as separate
entities.  Usually the entity STAG is trying to describe is Solar Seal DE, which undisputedly
assumed the tenancy of STAG's leased premises in Massachusetts.  As is evident from the
following, Solar Seal MA has essentially nothing to do with what happened.

Otherwise Counts II and III rested on information-and-belief allegations employing the rote words and phrases of successor liability and veil piercing claims.

Concerning successor liability, discovery has established undisputedly that Defendant Naverra Glass was not the tenant of the manufacturing facility in Connecticut and did not operate a manufacturing business in Connecticut or anywhere else.  It did not receive any of Solar Seal DE's equipment or serve any customers.  The tenant in the Connecticut premises – and the supposed continuator of Solar Seal DE's business – was a Delaware limited liability company, and not Naverra Glass, a Connecticut entity.  STAG has not since sought to add the Delaware entity as a defendant, probably because STAG has believed all along, as its Rule 30(b)(6) designee now states: (a) that Solar Seal DE moved only five percent (maybe ten) of its machines to Connecticut; (b) that the other ninety to ninety-five percent were – as STAG knowingly declined to allege in Counts II and III – auctioned off; (c) and that the Connecticut entity bought new equipment.  STAG still maintains that the Delaware entity in Connecticut continued to satisfy Solar Seal DE's customers.  After discovery, however, STAG cannot name one.  On this record, it should take a magically inventive opposition to justify Count II's survival.

On Count III, the motion record is one undisputed rejection after another of STAG's veil piercing allegations.  O3 did <u>not</u>, as alleged, "purchase substantially all of the assets from Solar Seal DE's predecessor."  Am. Compl. ¶ 44.  Solar Seal DE bought the manufacturing assets, as documented by a purchase and sale agreement between itself and the seller.  It borrowed funds for the purchase from O3 Industries pursuant to a documented loan agreement and paid off the loan.  That is how two companies preserve, not forfeit, corporate separateness.

O3 Industries owns none of Solar Seal DE.  It is owned by two individuals, Solar Seal DE by two others.  STAG knew that Solar Seal DE was a "stand alone" business with no

corporate parent, as e-mails from its diligence reflect.  Solar Seal DE was adequately capitalized according to STAG's in-house credit team before STAG accepted Solar Seal DE as assignee on the Massachusetts lease.  STAG regularly assesses whether to require guaranties as security for a tenant's obligations and, after review, asked nothing for Solar Seal DE. The auctioneer of the manufacturing equipment sent the auction proceeds to Solar Seal DE only.

STAG's post-discovery objective is to get the biggest judgment it can on Count I and to make life very rough for everyone associated with Solar Seal DE.  Two ways it cannot do that are by imposing successor liability on Naverra Glass and piercing Solar Seal DE's veil.  Summary judgment must enter.

## FACTS

The undisputed facts concerning the parties, other companies related to the captioned action, the acquisition of business assets in Massachusetts, commercial leases in Massachusetts and Connecticut, and the assignment and assumption of the Massachusetts lease in connection with the asset acquisition are as follows.  Solar Seal DE is a Delaware limited liability company that acquired assets of a manufacturing business, Shaw Glass Holdings (d/b/a Solar Seal). SMF ¶¶ 2, 13, 18; see also Affidavit of Daniel J. Dwyer ("Dwyer Aff.") Exs. 1, 10. To fund the purchase, Solar Seal SE used funds supplied by O3 Industries in a documented loan transaction. SMF ¶ 19; see also Dwyer Aff. Ex. 13 (Demand Line of Credit and Promissory Note). Solar Seal DE was to assume Shaw Glass Holdings' commercial lease of which STAG was landlord. SMF ¶ 18; see also Am. Compl. ¶¶ 13, 15, 18.  STAG's assent to the assignment and assumption was necessary. SMF ¶ 21; see also Am. Compl. Ex. A at 8.

STAG's vice president of asset management, Robert Hawkins ("Hawkins"), STAG's Boston-based credit review team, an in-house lawyer, and others set to work on diligence,

financial analysis, documentation, and ultimately approval of the assignment. SMF ¶¶ 23, 29-41; see also Dwyer Aff. Ex. 14, Rule 30(6)(6) Deposition of Robert Hawkins, dated October 3, 2024 ("Hawkins Depo.") at 13-17, 47-49, 64.

Solar Seal DE was a "newco." SMF ¶ 32; see also Dwyer Aff. Ex. 1. Jeremy Ozen, its manager and a member of O3 Industries, explained in writing to Hawkins that the assignee would be a "stand alone entity" with no corporate parent. SMF ¶¶ 26, 40; see also Hawkins Depo. 61-63; e-mails at Hawkins Depo Ex. 5. Hawkins understood that Jeremy Ozen was affiliated with O3 Industries and asked by e-mail for the identities of its owners.  SMF ¶ 28; E-mails at Hawkins Depo Ex. 4.  Jeremy Ozen forthrightly replied that he could not disclose that information.  Id.

After thorough diligence, STAG approved the lease assignment to Solar Seal DE.  SMF ¶ 39; see also Hawkins Depo. 64: 3-8.  STAG regularly considers whether to require security for its tenants' obligations. SMF ¶¶ 29-31, 33-37; see also Hawkins Depo. 12-15.  STAG's credit team recommended no guaranty or security as a backstop for Solar Seal DE's obligation. SMF ¶ 39; see also Hawkins Depo. 49.  Hawkins concurred with approving the assignment on those terms. SMF ¶¶ 40-41; see also Hawkins Depo. 49-50. Solar Seal DE bought the assets, assumed the lease, and ran the business. SMF ¶¶ 18, 47; Am Compl. Ex. E.

By June 2022, the business was operating at a loss.  SMF ¶ 48; see also Dwyer Aff. Ex. 21. Solar Seal DE sent notice that it would shut down. Hawkins Depo. 32: 7-11.  STAG knew this.  Id.  It inspected Solar Seal DE's facility (the leased premises) several times as the business wound down. SMF ¶ 54; see also Hawkins Depo. 112-13. STAG knew that Solar Seal DE was auctioning off its equipment.  Hawkins Depo. at 110.  STAG did nothing to secure an unsecured payment obligation. In this decision, STAG relied on: (a) its initial capitalization assessment; (b)

the fact that Solar Seal DE would be in possession of auction proceeds; and (c) its belief that the business remained a going concern.  Hawkins Depo. 106-07.  That particular belief was based on the statement of its broker, Collier's, purportedly that Solar Seal DE's management had signed a lease in Connecticut.  Id. at 107 & 115.

STAG testifies to a belief that five to ten percent of Solar Seal's manufacturing equipment was sent to a facility manufacturing glass products in Norwich, Connecticut. SMF ¶ 54; Hawkins Depo. 115: 14 – 116: 6. With discovery closed, STAG cannot identify a single customer of Solar Seal DE's that was served by the business in Connecticut. SMF  ¶ 57; Hawkins Depo. at 118-38.

STAG alleges the Connecticut business as Defendant Naverra Glass, a Connecticut limited liability company, originally formed, on August 25, 2022, as Solar Seal Architectural, LLC ("Solar Seal Architectural CT"). Am. Compl. ¶ 4. The tenant of the Connecticut premises was a Delaware limited liability company, also named Solar Seal Architectural LLC ("Solar Seal Architectural DE"), which changed its name to Naverra LLC on October 21, 2022.  SMF ¶¶ 14, 18; see also Dwyer Aff. Ex. 11; Hawkins Depo. Ex. 21. The Connecticut tenancy had begun on October 15, 2021, ten months before Defendant Naverra Glass was formed.

STAG also sues Defendant Solar Seal, LLC, ("Solar Seal MA"), for which a certificate of organization was filed on May 20, 2021. Am. Compl. ¶ 2; SMF ¶ 5; see also Dwyer Aff. Ex. 5. That entity, however, had no members, operating agreement, employees, or functions. SMF ¶ 6; see also Ozen Depo. 65: 11-15. It was not an operating business. Id.

Solar Seal DE's members are Michael Ozen and David Ozen. SMF ¶ 3; see also Dwyer Aff. Ex. 3. O3 Industries' members are Jeremy Ozen and Daniel Ozen. SMF ¶ 11; see also Dwyer Aff. Ex. 9; Ozen Depo. 24: 8, 28: 10-12.  Jeremy Ozen served also as Solar Seal DE's

manager.  SMF ¶ 4; <u>see</u> <u>also</u> Dwyer Aff. Ex. 4; Ozen Depo. at 62: 3-7. His operation in that role at Solar Seal DE is well documented. <u>Id.</u>  For the sake of non-repetition, other facts regarding corporate separateness are stated below as relevant.

## ARGUMENT

**1.  The Controlling Law.**

*A.  <u>The Summary Judgment Standard</u>*.    Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Once the moving party has satisfied its burden [under Rule 56], the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue." <u>PC Interiors, Ltd. v. J. Tucci Constr. Co</u>., 794 F. Supp. 2d 274, 275 (D. Mass. 2011).  To oppose summary judgment, the non-moving party may not simply state "conclusions the jury might imaginably reach; it must point to evidence that would support those conclusions." <u>Packgen v. BP Expl., Inc.</u>, 754 F.3d 61, 67 (1st Cir. 2014).

*B.    <u>Successor Liability</u>*.  <u>Milliken v. Duro Textiles LLC</u>, 451 Mass. 547 (2008) is the lead Massachusetts appellate decision on successor liability resulting from de facto merger and mere continuation.  The de facto merger theory of successor liability "has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity." <u>Id.</u> at p. 557.  Mere continuation "envisions a reorganization transforming a single company from one corporate entity into another." <u>Id.</u> at p. 557.

*C.    <u>Veil Piercing</u>*.  The standard for piercing the corporate veil in Massachusetts "is a demanding one." <u>Medici v. Lifespan Corp.</u>, 239 F.Supp.3d 355, 371 (D. Mass. 2017) quoting <u>Lothrop v. North American Air Charter, Inc.</u>, 95 F.Supp.3d 90, 100 (2015).  "Corporations are

presumed to be 'separate and distinct entities' notwithstanding relationships between them." Id.
"The corporate veil 'may be pierced only with reluctance and in extreme circumstances when
compelled by reasons of equity.'" Id.  The corporate form may be disregarded only when either
"there is active and direct participation by the representatives of one corporation, apparently
exercising some form of pervasive control, in the activities of another and there is some
fraudulent or injurious consequence of the inter-corporate relationship' [or] 'when there is a
confused intermingling of activity of two or more corporations engaged in a common enterprise
with substantial disregard of the separate nature of the corporate entities, or serious ambiguity
about the manner and capacity in which the various corporations and their respective
representatives are acting.'" Id. (emphasis in original) quoting My Bread Baking Co. v.
Cumberland Farms, Inc., 353 Mass. 614 (Mass. 1968).  "A strong relationship is not enough to
compel the disregard of separate entities."  Medici v. Lifespan Corp., 239 F.Supp.3d 355, 371
(D. Mass. 2017).

Although not altogether forbidden, veil piercing is rarely merited successful in contract
cases.  OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. 561, 566 (2012).
The presence of "control, even pervasive control, without more, is not a sufficient basis for a
court to ignore corporate formalities."  Id.

1. **The Undisputed Facts Preserve No Triable Issue on Count 2 Against Naverra Glass for Successor Liability.**

A certificate of organization for Defendant Naverra Glass (originally Solar Seal
Architectural LLC) was filed with the Connecticut Secretary of State in August 2022. SMF ¶ 7;
see also Dwyer Aff. Ex. 6. Naverra Glass has no operating agreement, officers, members,
financial or human resources department, pays no salaries, compensation, or distributions, files
no tax returns and has no customers.  Ozen Depo. at 153-55.  It was not the tenant of the

Connecticut premises:  the lease for that facility was executed in October 2021, ten months before Navarra Glass was organized. SMF ¶ 18; see also Hawkins Depo Ex. 21. In response to a subpoena duces tecum to the Connecticut facility's broker, STAG discovered no later than March 2024 that the Connecticut tenant was a Delaware limited liability company, also named Solar Seal Architectural LLC.  See Hawkins Depo. Ex. 21. That company changed its name to Naverra LLC in October 2022.  SMF ¶ 14; see also Dwyer Aff. Ex. 11.  Given every chance to factually buttress a successor liability claims against Naverra Glass, STAG simply could not. See Hawkins Depo. at 142-45.

That Naverra Glass did not yet exist at the time the Connecticut Lease was signed was already a matter of public record when STAG amended its complaint alleging Naverra Glass as successor. Since learning that the Connecticut tenant was not Naverra Glass, STAG has not sought leave further to amend its Amended Complaint or to substitute a party.  To say that STAG sued the wrong entity is not to imply that STAG would have had a good claim against the Delaware entity; it is to say that the Connecticut entity is not even colorably Solar Seal's successor.  Should STAG seek to further amend or substitute a party at this late date, Defendants will strongly oppose.[2]

STAG will point to several e-mails in an effort to raise a triable question that Solar Seal operated in Connecticut.  Before addressing them, Defendants underscore that such a thrust cannot change that STAG has sued an empty shell, not the Connecticut tenant or operator of the

---

2 In addition to its lateness and prejudice, such an addition would be futile.  To make up for having only a small fraction of Solar Seal DE's machinery, STAG testified to a belief that "the different entity would supply the rest of the equipment to run the Connecticut business."  Id. at 117-18. That is not a continuation of the old business.  Milliken v. Duro Textiles LLC, 451 Mass. 547 (2008).

Connecticut business.  That said, Exhibit 34 to Defendants' Rule 30(b)(6) deposition is a July 2021 e-mail from Ryan Spurgeon of a company called Antamex, Industries, in which Spurgeon wrote to the Connecticut landlord's broker, prior to execution of the Connecticut lease, that "Solar Seal LLC would be the company that the [Connecticut] lease would be structured with." SMF ¶ 65; <u>see also</u> Ozen Depo. Ex. 34.   Jeremy Ozen, Defendant's Rule 30(b)(6) designee, had not seen the e-mail before it was marked as an exhibit and testified, "I don't know what's going through Ryan's head."  Ozen Depo. at 157.  It does not matter: the Connecticut lease, still to be negotiated and executed, <u>was</u> <u>not</u> "structured with" Solar Seal.  Therefore what was "going through in Ryan's head" months before a lease was signed is unrelated to the lease deal as it was eventually done.  The same is true for an unsigned draft-with-blanks nondisclosure agreement on Solar Seal letterhead that Spurgeon sent to the Connecticut landlord and broker, also in July 2021.  SMF ¶ 66; <u>see also</u> Ozen Depo Ex. 35.

 Defendants should not have to fight further against an unpleaded successor liability claim involving a non-defendant entity.  The topic of the alleged equipment transfer is probative of the Amended Complaint's cynicism, however.  The pleading is thick with allegations such as "[o]n information and belief, O3 Industries caused Solar Seal to <u>transfer its assets, including specialized equipment</u> located at the Premises, <u>to the new manufacturing location in Connecticut</u> for nominal or no consideration to Solar Seal[,]" Am. Compl. ¶ 83, and thereby "relocated its business to Connecticut," <u>id.</u> ¶ 59; <u>see</u> <u>likewise</u> ¶¶ 63, 64 & 85. STAG never believed such a thing.  Now inhibited by the penalties of perjury, the most STAG will venture is that Solar Seal DE transferred five to ten percent of its machines to the Connecticut facility – an inverted version of the story told by Amended Complaint. SMF ¶ 52; <u>see also</u> Hawkins Depo. 112-113. Such litigation conduct brings to mind the adage that one who seeks equity must do equity.

   **2.**  **The Undisputed Facts Preserve No Triable Issue on Count 3 Against O3 Industries.**

   A.  _STAG's Veil Piercing Claim in a Contract Case Must Fail._  STAG seeks to pierce the corporate veil to put one count of contract liability on O3 Industries.  Corporate disregard is rarest in contract cases.  OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. 561, 566 (2012).  Like the captioned action, OMV Assocs. concerned veil piercing in the context of a commercial lease where, as here, the landlord was plaintiff.  The Massachusetts Appeals Court reversed a trial court's denial of the defendant's motion for judgment notwithstanding the verdict after the jury had come back for the landlord.  "First and foremost," wrote the Appeals Court, "the relationship between [landlord] and [tenant] was established by the written lease agreements."  Id. at 566. "We believe" the court continued, "that a contract-based relationship, where the parties are plainly identified and their rights and obligations clearly defined, is less likely to present the sort of rare situation that calls for corporate disregard in order to prevent gross inequity."  This Court applies Massachusetts law likewise.  Birbara v. Locke, 99 F.3d 1233, 1238 (1st Cir. 1996).

    STAG's contract with Solar Seal DE was formed when STAG consented to the assignment of a prior tenant's lease in connection with Solar Seal DE's acquisition of the prior tenant's manufacturing assets.  There was no fraud or misleading.  If anything, the undisputed record of written communications shows that Jeremy Ozen made a distinct effort to clarify points of corporate separateness that STAG should know.  For example, prior to Solar Seal DE's asset purchase, a turnaround professional named Neil Minihane introduced STAG's Robert Hawkins to Jeremy Ozen, telling Hawkins that "Jeremy and Daniel [Ozen] are looking to purchase the Solar Seal business…" SMF ¶ 25, 27; see also Hawkins Depo. Ex. 5.  Jeremy Ozen quickly clarified that an acquiring newco (not he and his brother) would purchase the business, operate as

a "stand alone entity" (saying that twice), and that the acquiring newco had no corporate parent and would be "taking over just the assets related to the operations in Massachusetts." Id. Jeremy Ozen provided then a draft assignment agreement making clear that a newco, not O3 Industries, would assume the lease. SMF ¶ 42; see also Hawkins Depo. Ex. 6. STAG then substituted its own form of assignment, also with a space for a newco, which became Solar Seal DE in the final assignment. SMF ¶ 46; see also Hawkins Depo Ex. 13. On this record, STAG had no question about the identity of its sole counterparty.

Moreover, Hawkins testified that:

In an assignment situation there's language with our form lease document that provides for landlord consent and <u>landlord consent is usually predicated on our sole discretion regarding the ability of the new lessee to pay. So we evaluate the new lessee through a credit review, discussions with the management team, and then our experience determines whether we're comfortable with that new lessee as a tenant.</u>

Hawkins Depo. at 13 (underline added). After diligence, STAG sought no security from O3 Industries, Jeremy Ozen, Daniel Ozen or anyone else. With respect to "newcos" specifically, STAG "talk[s] to the [newco's] management team. We'd still try to understand their capitalization," and if concerned, STAG sometimes requires that the lease obligation be "backstopped" by a guarantee. Id. at 14. STAG's credit team "look[s] at financial statements. They review operating statements from the new lessee and they have discussion with the new lessee regarding what their business pro forma looks like and what their plans are…." Hawkins Depo. at 14.

For purposes of the assignment agreement's clarity and validity, it does not matter who Solar Seal DE's alleged parent or members were, because STAG did not ask for a guaranty from any of them. In any event, there is no evidence that STAG was misled about the identities of Solar Seal DE's members, none of whom is O3 Industries, Daniel Ozen, or Jeremy Ozen.

In a contract case, the fraudulent conduct necessary to justify corporate disregard might occur by means of fraudulent inducement. The record contains no hint of it here and, in fairness, the Amended Complaint did not allege any. The "parties [were] plainly identified and their rights and obligations clearly defined." OMV Assocs., 82 Mass. App. Ct. at 566. STAG can sue for breach, but Solar Seal DE's corporate separateness on its contract obligation must be respected. Had STAG pleaded some underlying liability other than one count in contract, it still would have had an awfully hard time piercing the corporate veil, but it might not hit the wall of the corporate form with such force. Here STAG hits it hard.

### B.  *O3 Industries is Not Liable on Veil Piercing Criteria Generally.*

To meet the demanding standard for piercing the corporate veil, a plaintiff must show that "the parent exercises 'some form of pervasive control' of the activities of the subsidiary 'and there is some fraudulent or injurious consequence of the intercorporate relationship.'" Quincy Mut. Fire Ins. Co. v. Hoverzon, LLC, C.A. No. 23-10347-PBS, 2024 WL 1007815 at *8 (D. Mass., February 12, 2024) (Kelley, M.J.) quoting Scott v. NG U.S. 1, Inc., 1125, 1132 (Mass. 2008). "Alternatively, the corporate veil may be pierced 'when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting'...." Id. (same internal citation and quotations).

This Court is well familiar with the twelve factors commonly cited as evaluative criteria in veil piercing cases. Before putting an eye to that microscope, however, "[t]he focus of the inquiry is whether the two situations calling for disregard of corporate formalities are present[,]" id., and the second of the two situations is plainly not present. STAG does not allege between

O3 Industries and Solar Seal "a confused intermingling of activity of two or more corporations engaged in a common enterprise…"  STAG alleges that O3 Industries is a Manhattan-based family investment firm - not a glazier. Am. Compl. ¶¶ 5, 40.  It is clearly not a second manufacturer in a common industry, let alone "in common enterprise" with a bricks and mortar factory making glass products.  O3 Industries was alleged to own Solar Seal.  It does not.  Even if it did, "common enterprise" veil-piercing would be beside the point of what Count III is structured to accomplish.

Assuming that STAG could overcome the hurdles already explained, it would preserve a triable veil piercing claim, only if a jury could find that "the parent exercise[d] 'some form of pervasive control' of the activities of the subsidiary 'and there is some fraudulent or injurious consequence of the intercorporate relationship.'"  Scott v. NG U.S. 1, Inc., 1125, 1132 (Mass. 2008).  To be clear, pervasive control and injury must not simply both be present; the former must cause the latter.

The evaluative factors relevant to this analysis are:

(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Id.  STAG cannot establish pervasive control causing fraudulent or injurious harm, in either a big-picture sense or by close analysis of the criteria.  First, O3 Industries is not Solar Seal's parent.  There is no common ownership: Jeremy and Daniel Ozen are O3 Industries' members; David and Michael Ozen are Solar Seal's. SMF ¶¶ 3, 11; see also Dwyer Aff. Ex. 3, 9. STAG's allegation of O3 Industries' control over Solar Seal appears

to be that Jeremy Ozen, a member of O3 Industries, was also Solar Seal's manager. But a person's involvement in more than one entity is permissible and "to be expected when individuals serve as directors for both a parent and its subsidiary." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 129 (1st Cir. 2006).[3] This expectation is well-noted by courts in this judicial circuit when dismissing veil-piercing claims. Id. (affirming 12(b)(6) dismissal of veil-piercing claim) quoting Bibara v. Locke, 99 F.3d 1223, 1239-40 (1st Cir. 1996) (vacating jury verdict in favor of sophisticated party on veil-piercing claim). Not to be overlooked, Jeremy Ozen acted in an official though limited capacity for Solar Seal. SMF ¶ 4; see also Dwyer Aff. Ex 4; Ozen Depo. 62: 3-7. He was not a big brother who showed up at the company and took hold of the checkbook and ordered people around; his role was formally established, and he did a manger's work. Id. That is more evidence of well-preserved separateness than of pervasive control in a bad sense.

Next, the record establishes no confused intermingling of business assets. Solar Seal DE had a separate bank account, and the auctioneer of the manufacturing equipment sent the auction proceeds to that account, not O3 Industries.' Ozen Dep. 121: 2-4, 121: 10-14. There is no evidence of Solar Seal DE's tangible assets being mixed with O3 Industries.' Given the difference in the nature of the two businesses, such intermingling is hard to imagine. STAG's Rule 30(b)(6) deponent confirms the absence of evidence on intermingling:

> Q. You don't know anything, do you, about any intermingling of business assets between O3 Industries, LLC on the one hand and Solar Seal, LLC, the Delaware company, on the other; correct?
>
> A. That's correct.

---

[3] Since O3 Industries' and Solar Seal's relationship is not one of parent and subsidiary, Jeremy Ozen's involvement as Solar Seal manager is immunized even further than the Platten principle would immunize it.

Hawkins Depo. at 148: 6-15.

On the topic of Solar Seal DE's capitalization, STAG admits to having fully satisfied itself, at the inception of the relationship, that the business was sufficiently well capitalized. SMF ¶ 41; see also Hawkins Depo. 64: 3-8. Solar Seal DE then operated in normal course for fifteen months – reflecting sufficiency of capital.  The business subsequently failed because of machinery breakdown, not poor capitalization. Ozen Depo. 124: 22 – 125: 3.

Solar Seal DE and O3 Industries recognized corporate formalities and kept corporate records.  O3 Industries' meeting minutes have been produced along with Solar Seal's corporate resolutions, operating agreement, and member list. As stated above, Jeremy Ozen served in a distinct capacity for each company, but his roles were adequately formalized and documented. STAG itself testifies:

> Q. You don't know anything about the·non-observance of corporate formalities of Solar Seal, LLC, the Delaware limited company, do you?
>
> A. I do not.

Hawkins Depo. at 145

Insolvency at the time of the litigated transaction is the next criterion.  STAG does not allege this and it does not apply.  The transaction in question was the assignment, and STAG satisfied itself that its assignee was well-enough capitalized. SMF ¶¶ 39, 47; see also Hawkins Depo. 49, 64.

The next criterion, siphoning away of corporation's funds by dominant shareholder, does not match up with STAG's allegations much less its evidence.  STAG itself testifies:

> Q. As you sit here today, you don't know anything about O3 Industries, LLC siphoning away any assets of Solar Seal, LLC, the Delaware company, do you?
>
> A. I do not.

Hawkins Depo. at 148: 11-15.  O3 Industries is not a shareholder of Solar Seal DE, let alone the dominant shareholder, and its owners own none of Solar Seal DE's membership units.  There is no evidence that O3 Industries siphoned assets to itself of to Naverra Glass.  See Hawkins Depo. at 142-45.[4]

---

[4] The excerpt reads:

Q.  Let me put it differently.  We'll focus on the defendant Naverra Glass, LLC, the Connecticut corporation.  Do you know who owns that?

A.  The Connecticut LLC I do not.

Q.  Do you know who its directors are?

A.  I do not.

Q.  Do you know whether it leases any real estate?

A.  I do not.

Q.  Do you know whether it has manufactured any glass products?

A.  I do not.

Q.  Do you know whether it owns or possesses any glass manufacturing equipment?

A.  I do not.

Q.  You do not know it to have serviced any customers of Solar Seal, LLC, the Delaware limited liability company, that operated in Massachusetts;  correct?

A.  That's correct.

Q.  You don't know Naverra Glass, LLC, the Connecticut entity, to own any assets that had once been owned by Solar Seal, LLC, the Delaware limited  liability company; correct?

A.  I don't know what they own.

Q.  So you don't know of any assets owned by the Connecticut defendant that were owned at any time by Solar Seal, LLC, the Delaware entity; correct?

A.  That's correct.

The same is true for use of Solar Seal for transactions of the dominant shareholders. There are plenty of cases involving shareholders living large on their companies. Zimmerman v. Puccio, 613 F.3d 60, 74-75 (1st Cir. 2010) (applying Massachusetts law and affirming decision to pierce the corporate veil in "textbook case for lifting the corporate veil" where defendants, among other things, "siphoned money from corporate accounts to pay for personal expenses such as adult entertainment and costs associated with a yacht"); Pepsi-Co Metro. Bottling, Co. Inc. v. Checkers, Inc., 754 F.2d 10, 15 (1st Cir. 1985) (affirming piercing of corporate veil to find shareholders who ran corporation for "personal benefit" individually liable). STAG has alleged nothing of the kind with respect to Solar Seal.

Finally, regarding use of the corporation to promote fraud, STAG has simply never said that Solar Seal DE was, at the time of the lease assignment, used to perpetrate a fraud. Solar Seal DE was created as a newco to acquire the assets of Shaw Glass Holdings and to continue the business of glass fabrication. STAG acknowledges all of this. In addition, STAG has ceased telling its story about the interstate transportation of a whole factory. As STAG's vice president admits:

> Q. You don't know anything, do you, about the use of Solar Seal, LLC, the Delaware company, in the promotion of fraud; correct?

> A. I do not.

Hawkins Depo. at 149: 23 – 150: 2.

When Solar Seal DE ceased operations, STAG visited the premises several times, saw the employees drift away, practically watched as the machines were auctioned off, and did nothing to secure Solar Seal DE's obligation. SMF ¶ 52; see also Hawkins Depo 112-13. Explaining STAG's inaction, Hawkins explained that it relied on: (a) its initial

capitalization assessment of Solar Seal DE; (b) the fact that Solar Seal DE would be in possession of auction proceeds; and (c) its belief that the business remained a going concern.  Hawkins Depo. 106-07.  That particular belief was based on the statement of its broker, Collier's, purportedly that Solar Seal DE's management had signed a lease in Connecticut.  Id. at 107 & 115.

There was nothing intrinsically wrong with STAG's decision to rely on its broker and hope for the best.  But STAG could have identified the Connecticut tenant and examined its relation (if any) to Solar Seal DE.  STAG could have inquired about Solar Seal's ability to pay rent notwithstanding its evident shut down, and, depending on what STAG found, asked Solar Seal DE for security - or not.  The conspicuous point however is that Defendants did not make any fraudulent statement; STAG chose to rely on the broker's apparent oral remark about some vague kind of connection between Solar Seal DE and whoever was the tenant in Connecticut.

**WHEREFORE** Defendants Solar Seal LLC ("Solar Seal"), Naverra Glass LLC ("Naverra Glass"), and O3 Industries LLC ("O3 Industries") respectfully request that its motion be **ALLOWED** and that summary judgment be **ORDERED** against Plaintiff STAG Industrial Holdings LLC on Counts II and III of its Amended Complaint.

Respectfully submitted,

By their attorneys,

SOLAR SEAL LLC, SOLAR SEAL LLC,
NAVERRA GLASS LLC, and O3
INDUSTRIES LLC,

*/s/ Daniel J. Dwyer*
Daniel J. Dwyer (BBO No. 567026)
Mary Petronio (BBO No. 713542)
Verrill Dana LLP
One Federal Street, 20th Floor
Boston, MA 02110
ddwyer@verrill-law.com
(617) 309-2600

Dated:  November 26, 2024

## CERTIFICATE OF SERVICE

I, Daniel J. Dwyer, hereby certify that, on November 26, 2024, I electronically filed the foregoing document with the U.S. District Court for the District of Massachusetts through the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants.

*/s/ Daniel J. Dwyer*
Daniel J. Dwyer