UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STAG INDUSTRIAL HOLDINGS, LLC, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 23-cv-11726-ADB |
| | * | |
| SOLAR SEAL LLC, SOLAR SEAL LLC, | * | |
| NAVERRA GLASS LLC, and O3 | * | |
| INDUSTRIES LLC, | * | |
| | * | |
| | * | |
| Defendants. | | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Plaintiff STAG Industrial Holdings, LLC ("STAG") brings a breach of contract claim

based on the alleged breach of a commercial lease against Delaware limited liability company

Solar Seal LLC ("Solar Seal DE") and Massachusetts limited liability company Solar Seal LLC

("Solar Seal MA"), and also seeks to hold Naverra Glass LLC ("Naverra Glass") and O3

Industries LLC ("O3 Industries," collectively with Solar Seal DE and Solar Seal MA,

"Defendants") liable under theories of successor liability and corporate veil piercing.  Before the

Court are STAG's motion for partial summary judgment on its breach-of-contract claim (Count

I), [ECF No. 42], and Defendants' motion for summary judgment on STAG's claims against

Naverra Glass and O3 Industries (Counts II and III), [ECF No. 47].  For the reasons set forth

below, STAG's motion is **<u>DENIED</u>**, and Defendants' motion is **<u>GRANTED IN PART</u>** as to

Count II and **<u>DENIED IN PART</u>** as to Count III.

# I.    RELEVANT BACKGROUND

## A.    Material Facts[1]

STAG is a Delaware limited liability company that owns, leases, and develops industrial real estate.  [ECF No. 52 ¶ 1]; [ECF No. 48-14 at 11–12].  On November 1, 2012, STAG's predecessor-in-interest, Shaw Glass Company, Incorporated, entered into a commercial lease, as landlord, with Shaw Glass Holdings, LLC, and Consolidated Glass Holdings, Inc., as tenants, for the premises located at 55 Bristol Drive, South Easton, Massachusetts.  [ECF No. 52 ¶ 15]; [ECF No. 45-1 (lease)].  The initial 2012 lease had a five-year term, [ECF 45-1 at 2], but that term was extended by ten years in 2017, through October 31, 2027, [ECF No. 55 ¶ 2]; see also [ECF No. 45-2 (extension)].  STAG was ultimately assigned the landlord's rights and obligations under the lease on December 27, 2017, [ECF No. 52 ¶ 16], and Solar Seal DE, after diligence by STAG and with STAG's approval, was assigned the tenants' rights and obligations under the lease on April 1, 2021, [id. ¶¶ 18, 33–41, 47]; see also [ECF No. 45-4 (assignment)].

The lease is governed by Massachusetts law.  [ECF No. 45-1 at 18].  As relevant here, it contains a section entitled "**REMEDIES**" that permits the landlord, in the event of a default by the tenant, to "take any one or more of the following actions:"

> (a)    **Termination of Lease**.  Terminate this Lease by giving Tenant written notice thereof, in which event Tenant shall pay to Landlord the sum of (1) all Rent accrued hereunder through the date of termination, and (2) an amount equal to the total Rent that Tenant would have been required to pay for the remainder of the Term, plus Landlord's estimate of aggregate expenses of reletting the Premises, less the net proceeds, if any, of any reletting of the Premises during the remainder of what would

---

[1] The Court draws the facts from the parties' combined Rule 56.1 statement of material facts, which consists of the Parties' Joint Statement of Material Facts Concerning Defendants' Motion for Partial Summary Judgment on Counts II and III of the First Amended Complaint, [ECF No. 52], and the Parties' Joint Statement of Material Facts Concerning Plaintiff STAG Industrial Holdings, LLC's Motion for Summary Judgment on Count I (Breach of Contract) of the First Amended Complaint, [ECF No. 55], and documents referenced therein.

have been the then-current Term, after deducting Landlord's reasonable expenses in connection with such reletting, including repossession costs, brokerage commissions, and reasonable attorneys' fees for such reletting.

    (b)    **Termination of Possession**.  Terminate Tenant's right to possess the Premises without terminating this Lease by giving written notice thereof to Tenant, in which event Tenant shall pay to Landlord (1) all Rent and other amounts accrued hereunder to the date of termination of possession, and (2) all Rent and other sums required hereunder to be paid by Tenant during the remainder of the Term, diminished by any net sums thereafter received by Landlord through reletting the Premises during such period after deducting all reasonable costs incurred by Landlord in reletting the premises. Tenant shall not be entitled to the excess of any consideration obtained by reletting over the Rent due hereunder. . . . Unless Landlord delivers written notice to Tenant expressly stating that it has elected to terminate this Lease, all actions taken by Landlord to dispossess or exclude Tenant from the Premises shall be deemed to be taken under this Section 17(b).  If Landlord elects to proceed under this Section 17(b), it may at any time elect to terminate this Lease under Section 17(a).

    (c)    **Additional Rights of Landlord**.  As an alternative, at the election of the Landlord made any time after such termination, . . . then in addition to the foregoing remedies the entire balance of Base Rent and the other charges due hereunder shall become immediately due and payable by Tenant as liquidated damages. . . . Notwithstanding the foregoing, in the event the Premises or any part thereof shall be relet by the Landlord, the Tenant shall be entitled to a credit in the net amount of rent received by the Landlord in reletting, after deduction of all of Landlord's expenses reasonably incurred in reletting the Premises (including, without limitation, remodeling costs, attorneys' fees, brokerage fees and the like), and in collecting the rent in connection therewith.

. . .

    (e)    **Mitigating Damages**.  In connection with any Event of Default by Tenant, and subject to all of Landlord's rights contained herein, Landlord shall use commercially reasonable efforts to mitigate its damages hereunder including using commercially reasonable efforts to relet the Premises.

[Id. at 12–14].  The lease also provides, in Section 20, that "[t]he Tenant shall at the expiration or other termination of this lease remove all Tenant's goods and effects from the Premises . . . and repair any damages caused in connection therewith," and authorizes the landlord to "remove and store" any remaining property of the tenant "at Tenant's expense" or to keep, sell, or destroy it. [Id. at 14–15].

Because this case turns, in part, on corporate formalities, the Court describes the history of Defendants, and related entities, in somewhat greater detail.  O3 Industries is a Delaware limited liability company that was formed on February 28, 2017, [ECF No. 52 ¶ 10]; [ECF No. 48-2 at 23], and is owned by brothers Jeremy and Daniel Ozen.  [ECF No. 52 ¶ 11].  Jeremy serves as its CEO and Daniel as its president.  [ECF No. 52 ¶ 12].

Solar Seal DE was formed on March 11, 2021, and is owned by two other members of the Ozen family, Michael Ozen, the father, and David Ozen, another brother.  [ECF No. 52 ¶ 2]; [ECF No. 48-2 at 61, 75].  Further, Jeremy served as the manager of Solar Seal DE, [ECF No. 52 ¶ 4], and, at least initially, Daniel Ozen signed certain documents on its behalf, with Jeremy's authorization, [ECF No. 48-2 at 94–95]; see also [ECF No. 45-4 at 7 (April 1, 2021 assignment and assumption of lease signed by Daniel Ozen as "member" of Solar Seal DE)]; [ECF No. 48-10 at 15 (April 1, 2021 asset purchase agreement signed by Daniel Ozen as "manager" of Solar Seal DE)].  Solar Seal DE is distinct from Solar Seal MA, which was formed on May 20, 2021.  [ECF No. 52 ¶ 5].  Daniel Ozen is Solar Seal MA's manager of record, but this entity has no operating agreement, officers, members, employees, or customers.  [Id. ¶ 6].

On April 1, 2021, Solar Seal DE bought Shaw Glass Holdings' assets using money it had borrowed from O3 Industries; it repaid O3 Industries' loan in July 2021.  [ECF No. 52 ¶¶ 13, 18–20]; [ECF No. 48-10]; [ECF No. 48-13].  Solar Seal DE assumed the lease on April 1, 2021 and paid rent from April 2021 to September 2022, [ECF No. 55 ¶¶ 4–5]; [ECF No. 45-4], but, in the summer of 2022, it was suffering business losses and began shutting down operations, [ECF No. 52 ¶¶ 48–50], and, in early September 2022, it sold at public auction over 100 pieces of its large

manufacturing machinery, [id. ¶ 51].[2]  Solar Seal DE stopped paying rent in October 2022 and has not paid STAG since.  [ECF No. 55 ¶¶ 6, 18].  On December 7, 2022, STAG sent Solar Seal DE a notice of default for the months of October through December 2022.  [ECF No. 55 ¶ 7]; see also [ECF No. 45-5 (Dec. 7, 2022 notice of default)].  On January 4, 2023, STAG sent a second notice of default for the months of October 2022 through January 2023.  [ECF No. 55 ¶ 10]; see also [ECF No. 45-8 (Jan. 4, 2023 notice of default)].  Solar Seal DE did not cure either default, [ECF No. 55 ¶¶ 9, 11], and, on January 12, 2023, STAG sent Solar Seal DE a notice of termination, [id. ¶ 12]; [ECF No. 45-9 (notice of termination)].  The termination notice stated, as relevant here, that "this letter constitutes a **Notice of Termination** pursuant to Section 17 of the Lease," and noted that "Tenant has abandoned the Premises, thereby terminating any possessory interest Tenant has in the Premises."  [ECF No. 45-9 at 2].  STAG recovered possession on February 10, 2023, in accordance with a letter agreement between STAG and Solar Seal DE.  [ECF No. 55 ¶¶ 14–15]; see also [ECF No. 45-10 (Jan. 24, 2023 letter from counsel for STAG to Solar Seal DE)].  STAG spent approximately $2.2 million on improving the premises following Solar Seal DE's departure, [ECF No. 55 ¶ 21], but did not secure a replacement tenant, [id. ¶ 23].

Naverra Glass is a Connecticut limited liability company originally formed in Connecticut as Solar Seal Architectural, LLC on August 25, 2022; it acquired its current name on January 31, 2023.  [ECF No. 52 ¶¶ 7–8].  Jeremy Ozen is its manager of record, but it has no operating agreement, officers, members, employees or customers.  [Id. ¶¶ 7, 9].  Naverra Glass is distinct from non-party Naverra LLC, which is a Delaware limited liability company originally

---

[2] STAG's asset manager for the premises, Robert Hawkins, testified on behalf of STAG that, based on what Solar Seal DE employees had told STAG, about "[f]ive to ten percent" of Solar Seal DE's equipment had been moved to Connecticut before the auction.  [ECF No. 53-4 at 2, 11].

formed in Delaware as Solar Seal Architectural LLC; it acquired its current name on October 21, 2022.  [Id. ¶ 14].  Naverra LLC leases a manufacturing facility in Connecticut.  [Id. ¶ 17].

### B.    Procedural History

On April 19, 2023, STAG initiated this lawsuit in Massachusetts state court, [ECF No. 1 at 1], and filed the operative First Amended Complaint on June 23, 2023, [ECF No. 2-1 ("First Amended Complaint" or "FAC")].  Count I of that complaint is a breach-of-contract claim against Solar Seal MA and Solar Seal DE, [FAC ¶¶ 66–74]; see also [id. ¶ 3]; Count II alleges that Naverra Glass is liable as a successor to Solar Seal MA and Solar Seal DE, [id. ¶¶ 75–77]; and Count III alleges that O3 Industries is liable to STAG under corporate veil piercing principles, [id. ¶¶ 78–86].  On July 28, 2023, Defendants removed this action to federal court. [ECF No. 1].  Defendants answered the First Amended Complaint, [ECF No. 8], and, before the end of discovery, filed a motion for judgment on the pleadings on Counts II and III, [ECF No. 19], which the Court denied on May 30, 2024, [ECF No. 29].  On November 26, 2024, STAG filed a motion for partial summary judgment on Count I, [ECF No. 42], and Defendants filed a motion for summary judgment on Counts II and III, [ECF No. 47].  Both motions are fully briefed.  [ECF Nos. 54, 59, 64]; [ECF Nos. 51, 57].

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is considered "genuine" when "the evidence of record permits a rational factfinder to resolve it in favor of either party."  Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4–5 (1st Cir. 2010) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  A fact is considered "material" when "its existence or nonexistence

has the potential to change the outcome of the suit." Id. at 5 (citing Martínez v. Colón, 54 F.3d 980, 984 (1st Cir. 1995)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the Court] to specific evidence in the record that would be admissible at trial." Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. at 4–5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). Once the moving party has laid out its basis for summary judgment, the burden shifts to the party opposing summary judgment to demonstrate, "with respect to each issue on which she would bear the burden of proof at trial, . . . that a trier of fact could reasonably resolve that issue in her favor." Borges, 605 F.3d at 5.

On a motion for summary judgment, the Court reviews "the entire record in the light most hospitable to the party opposing summary judgment." Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 13 (1st Cir. 2003) (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)). Where inferences are to be drawn from the proffered facts, those inferences "must be viewed in the light most favorable to the party opposing the motion." Oleskey ex rel. Boumediene v. U.S. Dep't of Def., 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (citing Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency, 610 F.2d 824, 836 (D.C. Cir. 1979)). The Court, however, "safely may ignore 'conclusory allegations, improbable inferences, and unsupported speculation.'" Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (quoting Medina-Muñoz, 896 F.2d at 8). These principles also apply when the Court reviews cross-motions for summary judgment: The Court "reviews each motion independently and

views the record in the light most favorable to the nonmoving party when doing so." Dahua

Tech. USA Inc. v. Feng Zhang, 988 F.3d 531, 539 (1st Cir. 2021) (citation modified).

## III.    DISCUSSION

### A.    STAG's Motion for Summary Judgment on Count I

The parties do not dispute that Solar Seal DE defaulted on the lease by failing to make

certain rent payments. See [ECF No. 43 at 6]; [ECF No. 54 at 1]. Instead, their dispute centers

on whether the Court may grant summary judgment on Count I or whether a trial on damages is

necessary. STAG argues that it is entitled, as a matter of law, to $282,975.67 in unpaid rent,

$58,556.82 in expenses incurred by STAG following Solar Seal DE's surrender of the premises,

and $4,454,736 in liquidated damages. [ECF No. 43 at 1].[3] Solar Seal DE does not appear to

contest the amount of unpaid rent it owes, but it does dispute STAG's claimed expenses. [ECF

No. 55 ¶ 16]. Solar Seal DE also argues that STAG is not entitled to liquidated damages under

the lease, and that a trial is necessary to determine whether STAG breached its contractual duty

to mitigate damages, which Solar Seal DE contends should eliminate or reduce any damages it

owes. [ECF No. 54 at 9].

Under Massachusetts law, interpretation of a contract is a question of law. Coll v. PB

Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995); Balles v. Babcock Power Inc., 70

N.E.3d 905, 911 (Mass. 2017). "'Should the court find the contract language unambiguous, we

interpret it according to its plain terms.' . . . If those plain terms unambiguously favor either side,

summary judgment is appropriate." Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir.

---

[3] These figures are taken from a demand for payment that STAG sent to Solar Seal DE on April 7, 2023, [ECF No. 55 ¶ 17]; [ECF No. 45-13], but are not included in the parties' Rule 56.1 statements.

1998) (citation modified) (quoting <u>Den norske Bank AS v. First Nat'l Bank</u>, 75 F.3d 49, 52 (1st Cir. 1996)).

Here, under the plain terms of the lease, STAG is entitled to unpaid rent, certain expenses, and liquidated damages <u>less</u> any net amount of rent that STAG could have achieved by using commercially reasonable efforts to mitigate damages. The Court cannot decide as a matter of law, however, whether STAG adequately mitigated damages, and, thus, the amount of liquidated damages to which it is entitled under the lease.

With respect to unpaid rent, it is undisputed that Solar Seal DE did not pay rent between October 2022 and January 2023, [ECF No. 55 ¶¶ 6, 18], and, under the plain terms of the lease, STAG is entitled to rent arrearage for this period, [ECF No. 45-1 at 13]. The parties debate whether STAG's January 12, 2023 notice was a termination of lease under Section 17(a) of the lease (as STAG argues) or a termination of possession under Section 17(b) of the lease (as Solar Seal DE argues). [ECF No. 54 at 9–12]; [ECF 59 at 2–4]. As STAG correctly notes, [ECF No. 59 at 3–4], however, this debate is irrelevant to the amount of unpaid rent owed to STAG, since either subsection entitles STAG to such rent, in addition to future rent that Solar Seal DE would have been required to pay for the remainder of the term of the lease, [ECF No. 45-1 at 13]. Regardless of whether STAG in its January 12, 2023 notice terminated the lease or merely terminated possession, STAG is entitled to all unpaid rent accrued under the lease through the date of termination.[4]

---

[4] Solar Seal DE argues that, if STAG invoked Section 17(b), Solar Seal DE would be allowed to make future rent payments over time, but if STAG invoked Section 17(a), Solar Seal would be required to pay "the balance of rent in one amount." [ECF No. 54 at 2]. In light of the Court's conclusion, <u>infra</u>, that STAG is entitled to liquidated damages under Section 17(c), it does not appear to matter whether STAG's notice of termination invoked Section 17(a) or Section 17(b).

9

With respect to expenses, there is no genuine dispute that Solar Seal DE did not remove all of its property from the premises, and, as such, under Section 20 of the lease, [ECF No. 45-1 at 14–15], STAG was entitled to remove that property at Solar Seal DE's expense.  In an attempt to dispute STAG's "clean-up" damages, Solar Seal DE proffers an affidavit by its manager, Jeremy Ozen, that states that "STAG wrongly alleges that Solar Seal DE abandoned dumpsters full of trash" and that "[t]he dumpsters in question belonged to the trash company," not Solar Seal DE.  [ECF No. 56 ¶ 7].  STAG has, however, put forward undisputed evidence that Solar Seal DE left behind property other than the dumpsters, see [ECF No. 55 ¶ 16]; [ECF No. 45-11 at 12]; [ECF No. 45-13 at 17], as well as evidence specifically distinguishing between the costs attributable to removal of the dumpsters ($1,710.82) and the costs attributable to removal of other property ($56,846).  See [ECF No. 59 at 2 n.2]; [ECF No. 45-13 at 2].  Thus, only a small portion of STAG's claimed clean-up damages are genuinely disputed, namely, the costs attributable to the removal of the dumpsters.[5]  A jury will have to decide whether the dumpsters were Solar Seal DE's property such that STAG is entitled to these damages.

As to liquidated damages, Solar Seal DE first appears to suggest that Section 17(c), which provides for the immediate payment of the "entire balance of Base Rent and the other charges due hereunder," [ECF No. 45-1 at 13], is not available to STAG because it is "an 'alternative' remedy," [ECF No. 54 at 13].  The plain language of Section 17(c) refutes this

---

That said, the Court is not persuaded by Solar Seal DE's somewhat tortured attempt, [ECF No. 54 at 9–12], to argue that STAG's notice of termination, which explicitly specified that it was a "termination of the Lease," [ECF No. 45-9 at 2], was a termination of possession only.

[5] In the memorandum accompanying its motion for summary-judgment, [ECF No. 43 at 7], and in its reply, [ECF No. 59 at 2], STAG claims that summary judgment should be entered against Solar Seal DE as to the full amount of clean-up damages ($58,556.82) but, in a footnote in its reply, STAG appears to concede that Solar Seal DE has disputed the portion of those damages related to the dumpsters, [ECF No. 59 at 2 n.2].

reading:  Section 17(c) is titled "**Additional Rights of Landlord**," and it specifies that liquidated

damages are "in addition to the foregoing remedies."  [ECF No. 45-1 at 13].  Solar Seal DE also

argues, however, that Section 17(c) requires that it get credit for any reletting proceeds obtained

by STAG,[6] and further, that there is a material dispute of fact regarding whether STAG failed to

mitigate damages by not attempting to relet the premises.  [ECF No. 54 at 13].

      The Court agrees that there is a genuine dispute as to whether STAG failed to mitigate

damages.  It is true that Section 17(c) does not, by its own terms, create an affirmative obligation

for STAG to relet the premises in the event of default by Solar Seal DE, noting only that Solar

Seal DE "shall be entitled to a credit in the net amount of rent received by" STAG through

reletting.  [ECF No. 45-1 at 13].  A separate section, however, Section 17(e), requires STAG to

"use commercially reasonable efforts to mitigate its damages [under the lease] including using

commercially reasonable efforts to relet the Premises."  [Id. at 14].  Whether STAG breached

this duty to mitigate is genuinely disputed.  [ECF No. 55 ¶¶ 19–23].  Specifically, STAG's asset

manager for the premises, Robert Hawkins, testified on behalf of STAG that STAG had

---

[6] Solar Seal DE argues that the lease's offset of the landlord's reletting proceeds against the damages owed by the tenant is uncapped, that is, that Solar Seal DE should receive such proceeds even to the extent they exceed what Solar Seal DE owes STAG under the lease.  [ECF 54 at 12–13].  This contention—which would require that the landlord share its profits with a defaulting tenant without any limitation—has no basis in the plain language of the lease.  Section 17(a) requires the defaulting tenant to pay the landlord certain damages "less the net proceeds, if any, of any reletting the Premises."  [ECF No. 45-1 at 13 (emphasis added)].  Section 17(b) similarly provides that the damages owed to the landlord are "diminished by any net sums thereafter received . . . through reletting the Premises," and explicitly notes that the tenant "shall not be entitled to the excess of any consideration obtained by reletting the Premises."  [Id. (emphasis added)].  And Section 17(c) provides that, in the event the landlord relets the premises, the tenant "shall be entitled to a credit in the net amount of rent received by the [l]andlord in reletting."  [Id. (emphasis added)].  In other words, all three sections treat any reletting proceeds as an offset and do not entitle Solar Seal DE to any proceeds that exceed the amount of its liability to STAG.

"marketed the building consistently" since it took possession in February 2023, [ECF No. 45-11 at 8], but he also conceded that STAG had undertaken additional improvements beyond what was required to restore the premises to the condition in which Solar Seal DE was required to return the property to STAG, [id. at 8–9]. Hawkins estimated that it would have taken STAG "[m]aybe six months" to return the premises to their proper condition, [id. at 8], but acknowledged that STAG had held an open house for brokers only in the summer of 2024, that is, nearly a year-and-a-half after STAG retook possession, [id. at 6–7, 9]. In light of this testimony, the Court cannot determine as a matter of law whether STAG's reletting efforts were commercially reasonable such that STAG complied with its duty to mitigate under Section 17(e). See, e.g., In re Malden Mills Indus., Inc., 303 B.R. 688, 705 (B.A.P. 1st Cir. 2004) ("Any determination regarding the reasonableness of a landlord's actions to mitigate damages post-termination presents a question of fact for the trial court.").[7]

The parties disagree on the impact of any failure by STAG to mitigate damages. STAG argues that, under Massachusetts law, because Section 17(c) is an enforceable liquidated-damages provision that does not itself create a duty to mitigate, whether STAG failed to mitigate is irrelevant and STAG is entitled to the full amount of accelerated rent (and, thus, to summary judgment). [ECF No. 59 at 6–7]. Solar Seal DE argues that the Court must give force to the mitigation clause in Section 17(e), and that STAG's breach of that clause was either a material

---

[7] STAG's argument that Solar Seal DE "has failed to establish that STAG has not used commercially reasonable efforts to mitigate damages," [ECF No. 59 at 7], misstates the burden at summary judgment. It is sufficient for Solar Seal DE to "demonstrate that a trier of fact could reasonably resolve [the] issue [of mitigation] in its favor," Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018) (quoting Borges, 605 F.3d at 5), and the Court finds that Solar Seal DE has done so.

breach that voided Solar Seal DE's obligation to pay any damages <u>or</u> requires STAG's damages to be reduced by the net proceeds STAG would have received had it complied with its duty to mitigate (thus requiring a trial on mitigation).  [ECF No. 54 at 13–14]; [ECF No. 64].

The Court begins with Solar Seal DE's material-breach argument.  STAG does not explicitly respond to this argument, <u>see generally</u> [ECF No. 59], but it strikes the Court as somewhat curious and ultimately unpersuasive.  Under Massachusetts law, a breach is material if it involves "an essential and inducing feature of the contract."  <u>Teragram Corp. v. Marketwatch.com, Inc.</u>, 444 F.3d 1, 11 (1st Cir. 2006) (quoting <u>Lease-It, Inc. v. Mass. Port Auth.</u>, 600 N.E.2d 599, 602 (Mass. App. Ct. 1992)).  Such a breach by either party "excuses the other party from further performance under the contract."  <u>Id.</u> (quoting <u>Lease-It</u>, 600 N.E.2d at 602).  Here, however, it makes little sense to treat STAG's purported failure to mitigate damages, which postdates Solar Seal DE's breach of the lease, as excusing Solar Seal DE from its antecedent obligation to pay STAG damages as a result of Solar Seal DE's default.  <u>See</u> <u>New Bos. Garden Corp. v. Baker</u>, No. 97-cv-1433A, 1999 WL 98099, at *4 (Mass. Super. Feb. 12, 1999) (rejecting similar argument because it "would lead to the unfair result that [plaintiff's] failure to totally mitigate its damages would excuse defendants from paying <u>anything</u> as a result of their breach of contract" and noting that no "case so construing similar language in a contract has been called to the [c]ourt's attention"); 23 Samuel Williston & Richard A. Lord, <u>A Treatise on the Law of Contracts</u> § 63.3 (4th ed. 2025 update) ("A party who <u>first</u> commits a material breach cannot enforce the contract." (emphasis added)).  Instead, the general rule is that a failure to mitigate operates to prevent the plaintiff from recovering only those "damages that were avoidable by the use of reasonable precautions on his part."  <u>Burnham v. Mark IV Homes, Inc.</u>, 441 N.E.2d 1027, 1034 (Mass. 1982); <u>see also</u> <u>Cambridge Plating Co. v. Napco, Inc.</u>, 85 F.3d

13

752, 772 (1st Cir. 1996) ("The general principle is well settled that a party cannot recover for harms that its own reasonable precautions would have avoided." (quoting Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 72 F.3d 190, 204–05 (1st Cir. 1995))).  Thus, the Court is not convinced that, if a jury were to find that STAG failed to mitigate and that this failure constituted a material breach of the lease, see Teragram Corp., 444 F.3d at 11 ("[T]he materiality of a breach of contract is generally a question for the trier of fact to decide."), Solar Seal DE would be excused entirely from paying post-termination damages under Section 17(c).

Solar Seal DE is on better footing with its second argument, that is, that STAG's liquidated damages should be reduced to account for any failure by STAG to mitigate.  As a general matter, "in the case of an enforceable liquidated damages provision, mitigation is irrelevant and should not be considered in assessing damages."  NPS, LLC v. Minihane, 886 N.E.2d 670, 675 (Mass. 2008); see also Cummings Props., LLC v. Hines, 217 N.E.3d 604, 610 (Mass. 2023) (enforcing liquidated damages clause "according to the terms of the contract regardless of when, if ever, [the plaintiff] was able to relet the premises"); Panagakos v. Collins, 956 N.E.2d 226, 230 (Mass. App. Ct. 2011) (reversing trial-court decision that considered mitigation where commercial lease contained "default/acceleration clause").  That said, it is also a fundamental principle of contract law that a contract must be interpreted "in a manner that gives reasonable effect to each of its provisions," if possible, Weiss v. DHL Exp., Inc., 718 F.3d 39, 45 (1st Cir. 2013), and courts read each provision "in the context of the entire contract rather than in isolation," Brigade Leveraged Cap. Structures Fund Ltd. v. PIMCO Income Strategy Fund, 995 N.E.2d 64, 69 (Mass. 2013) (citation omitted).  And Massachusetts law generally requires courts to enforce mitigation clauses such as the one contained in the lease.  See, e.g., Krasne v. Tedeschi & Grasso, 762 N.E.2d 841, 846–47 (Mass. 2002).

Here, the Court concludes that STAG's damages under Section 17(c) must be reduced by the net proceeds, if any, that STAG would have received by complying with its contractual duty to mitigate.  This conclusion flows from the plain terms of Section 17(c), which expressly provides for a credit to Solar Seal DE of any reletting proceeds, and Section 17(e), which imposes on STAG a duty to mitigate, including by making commercially reasonable efforts to relet the premises.  See [ECF No. 45-1 at 13–14].  The Court recognizes that the categorical language of Minihane and Cummings may appear, at first blush, to preclude any consideration of mitigation, given that the lease contains what Solar Seal DE concedes, [ECF No. 54 at 9], is an enforceable liquidated-damages provision.  The Court is persuaded, however, that Minihane and Cummings are distinguishable, in that the contracts at issue there, unlike the lease here, did not expressly impose on the plaintiff a duty to mitigate.  See [ECF Nos. 64-1, 64-2]; cf. Int'l Fid. Ins. Co. v. Aulson Co., No. 11-cv-9240, 2012 WL 6021130, at *7 (S.D.N.Y. Dec. 4, 2012) (applying Minihane and noting that "[t]he defendants have not shown that the plaintiffs had any obligation to mitigate damages").  Moreover, the reasoning of Minihane supports enforcing the mitigation clause in Section 17(e), despite the liquidated-damages provision in Section 17(c).  Minihane found that considering mitigation was "illogical" and "defeat[ed] the purpose of liquidated damages provisions" because such provisions embody the parties' "agree[ment] in advance to a sum certain that represents a reasonable estimate of potential damages."  886 N.E.2d at 675–76. Here, by contrast, the parties expressly agreed, in Section 17(c), to offset liquidated damages by any reletting proceeds and, in Section 17(e), that STAG would make commercially reasonable efforts to relet the premises, [ECF No. 45-1 at 13–14].  The Court recognizes that this makes Section 17(c) an unusual and perhaps somewhat self-defeating liquidated-damages clause, in that it fails to provide the "peace of mind and certainty of result" that such clauses typically provide.

Minihane, 886 N.E.2d at 675 (quoting Kelly v. Marx, 705 N.E.2d 1114, 1117 (Mass. 1999)).

That is not a reason, however, to read Section 17(c) in isolation from Section 17(e), Brigade

Leveraged Cap. Structures Fund Ltd., 995 N.E.2d at 69, or to read Section 17(e) out of the lease

entirely, see Weiss, 718 F.3d at 45.  The logical reading of the lease, taken as a whole, is that the

damages Solar Seal DE owes to STAG under Section 17(c) cannot be calculated without taking

STAG's efforts to mitigate under Section 17(e) into account.  Because assessing the sufficiency

of those efforts requires a trial, STAG's motion for summary judgment on Count I, [ECF No.

42], is **DENIED**.[8]

### B.    Solar Seal DE's Motion for Summary Judgment on Counts II and III

#### 1.    Successor Liability

In Count II of the First Amended Complaint, STAG seeks to hold liable Naverra Glass as

the successor of Solar Seal DE, alleging that Solar Seal DE relocated its business to Connecticut

where it continued operating as Naverra Glass.  [ECF No. 2-1 ¶¶ 59–65, 75–77].  Defendants

argue that they are entitled to summary judgment on Count II because the entity that leased the

Connecticut facility was not Naverra Glass, but a different entity, Naverra LLC, and that only a

very small portion of Solar Seal DE's equipment was transferred to that entity.  [ECF No. 49 at

2].  In response, STAG accuses Defendants of "elevat[ing] form over substance," [ECF No. 51 at

2], arguing that Defendants were on notice that it was pursuing a claim against Naverra LLC and

---

[8] Although STAG brought Count I of the First Amended Complaint against both Solar Seal DE and Solar Seal MA, [FAC ¶¶ 66–74], it is undisputed that Solar Seal MA was not an operating business, [ECF No. 52 ¶ 6], and was not party to the lease between STAG and Solar Seal DE, [id. ¶¶ 46–47]; [ECF No. 45-4].  In their opposition to STAG's motion for summary judgment, Defendants argued that the motion "does not concern" Solar Seal MA, [ECF No. 54 at 1 n.1], and STAG in its reply did not argue otherwise, see generally [ECF No. 59].  Accordingly, the Court holds as a matter of law that STAG cannot recover from Solar Seal MA under Count I, and any trial on damages on Count I should focus on Solar Seal DE.

that Defendants created "the same entities in multiple jurisdictions" in "an effort to frustrate or avoid creditors," [id. at 13].

"As a general rule of corporate law, the liabilities of a corporation are not imposed upon its successor." Smith v. Kelley, 139 N.E.3d 314, 322 (Mass. 2020). There are four exceptions to this rule under Massachusetts law: A successor in interest may be held liable when "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 254–55 (Mass. 2008) (quoting Guzman v. MRM/Elgin, 567 N.E.2d 929, 931 (Mass. 1991)).

Here, STAG concedes that Naverra Glass, the entity named in the First Amended Complaint, is not Solar Seal DE's successor in interest, see [ECF No. 51 at 12], which forecloses successor liability against Naverra Glass. Nevertheless, STAG argues it should be allowed to proceed against Naverra LLC under a "fraudulent effort" theory. [Id. at 12–13]. The Court is not persuaded.

As an initial matter, if STAG wished to recover from Naverra LLC in this litigation, it should have moved for leave to amend its complaint to add that entity as a defendant.[9] Courts have discretion to allow such amendments, especially when they are designed to remedy a misidentification caused by confusingly similar names of corporate entities. E.g., Krupski v.

_____

[9] Solar Seal DE claims that STAG has been on notice that it had named the incorrect entity since March 2024, when it learned the identity of the tenant of the Connecticut lease. [ECF No. 49 at 8]. STAG acknowledged at its October 3, 2024, Rule 30(b)(6) deposition, before Defendants moved for summary judgment, that STAG had named the incorrect entity in its First Amended Complaint. [ECF No. 48-14 at 141–42].

17

Costa Crociere S.p.A., 560 U.S. 538, 556 (2010); Morel v. DaimlerChrysler AG, 565 F.3d 20, 27 (1st Cir. 2009); Roberts v. Michaels, 219 F.3d 775, 779 (8th Cir. 2000). STAG has not moved for leave to amend or argued that it satisfies the standard for such an amendment. See O'Connell v. Hyatt Hotels of Puerto Rico, 357 F.3d 152, 155 (1st Cir. 2004). In any case, even if an amendment were allowed, summary judgment would still be appropriate as against the incorrectly named entity, Naverra Glass.

Moreover, on the present record, the Court is skeptical that STAG has created a triable issue as to whether Naverra LLC is liable as Solar Seal DE's successor. In its summary-judgment opposition, STAG does not reassert the "de facto merger" or "mere continuation" theories that it pressed in opposing Defendants' motion for judgment on the pleadings.[10] [ECF No. 24 at 3]. Instead, STAG argues, without much elaboration, that Naverra LLC is liable under the "fraudulent effort" theory of successor liability. [ECF No. 51 at 13]. In determining whether this theory applies, Massachusetts courts consider the presence of certain "badges of fraud," including

> (1) actual or threatened litigation against the [transferor]; (2) a purported transfer of all or substantially all of the [transferor's] property; (3) insolvency or other unmanageable indebtedness on the part of the [transferor]; (4) a special relationship between the [transferor] and the transferee; and (5) retention by the [transferor] of the property involved in the putative transfer.

In re QR Props., LLC, 485 B.R. 20, 25 (Bankr. D. Mass. 2013) (quoting Palmer v. Murphy, 677 N.E.2d 247, 255–56 (Mass. 1997)). "The presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to

---

[10] The Court notes that, with respect to Naverra LLC, Defendants' argument once again focuses exclusively on the limited transfer of assets from Massachusetts to Connecticut. [ECF No. 49 at 9]. As the Court made clear in its ruling on Defendant's motion for judgment on the pleadings, however, "[a]ssets are . . . just one of many factors relevant to the analysis." [ECF No. 29].

defraud." Beal Bank, SSB v. Pittorino, 177 F.3d 65, 70 (1st Cir. 1999) (quoting Max Sugarman

Funeral Home, Inc. v. A.D.B. Invs., 926 F.2d 1248, 1254 (1st Cir. 1991)).  Here, STAG has not

developed a legal or evidence-based argument that would support a finding of the presence of,

any such badge of fraud, stating only that Defendants "moved at least some of the equipment not

sold at the auction to Connecticut."  [ECF No. 51 at 13].  On this record, STAG has not shown

that a trier of fact could reasonably resolve the issue of successor liability in its favor, even as to

Naverra LLC.  Borges, 605 F.3d at 5.  Accordingly, Defendants' motion for summary judgment

on Count II is **GRANTED**.

### 2.    Veil Piercing

In Count III of the First Amended Complaint, STAG seeks to hold O3 Industries liable

under corporate veil piercing principles.  [ECF No. 2-1 ¶¶ 39–47, 78–86].  Defendants argue they

are entitled to summary judgment on Count III because STAG's contract was with Solar Seal

DE, not O3 Industries, and because there is no evidence that O3 Industries and Solar Seal DE

either engaged in a "common enterprise" in substantial disregard of corporate separateness or

that O3 Industries exercised "pervasive control" over Solar Seal DE resulting in fraud or injury.

[ECF No. 49 at 10–18].  STAG responds that the veil-piercing analysis is fact-intensive, and that

the record contains sufficient evidence in support of veil piercing to survive summary judgment.

[ECF No. 51 at 15–18].

Massachusetts law governs the veil-piercing analysis because the underlying claims for

breach of contract are governed by Massachusetts law.  Scallop Imaging, LLC v. Vision Techs.,

Inc., No. 17-cv-10092, 2020 WL 7338498, at *3 (D. Mass. Dec. 14, 2020); [ECF No. 45-1 at

18].  The standard for piercing the corporate veil "is a demanding one."  Medici v. Lifespan

Corp., 239 F. Supp. 3d 355, 372 (D. Mass. 2017) (quoting Lothrop v. N. Am. Air Charter, Inc.,

95 F. Supp. 3d 90, 100 (D. Mass. 2015)).  "[C]orporate veils are pierced only in 'rare particular situations,' and only when an 'agency or similar relationship exists between the entities.'"  Scott v. NG U.S. 1, Inc., 881 N.E.2d 1125, 1132 (Mass. 2008) (quoting My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748, 752 (Mass. 1968)).  Two specific scenarios in which veil piercing may be warranted are (1) when the representatives of one corporate entity "exercise[e] some form of pervasive control" over the activities of another "and there is some fraudulent or injurious consequence of the intercorporate relationship," and (2) "when there is a confused intermingling of activity" of two entities "engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting."  My Bread Baking, 233 N.E.2d at 752; see also NuVasive, Inc. v. Rival Med., LLC, No. 21-cv-11644, 2024 WL 816271, at *4 (D. Mass. Feb. 27, 2024) (noting applicability of veil piercing principles to limited liability companies).  "While several courts and commentators have suggested that it should be more difficult to pierce the veil in a contract case than in a tort case, piercing the corporate veil is not, as a matter of law, unavailable in contract cases."  NuVasive, 2024 WL 816271, at *5 (citation modified).

> Courts consider twelve factors in evaluating whether to pierce the veil:
>
> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

Scott, 881 N.E.2d at 1132 (quoting Att'y Gen. v. M.C.K., Inc., 736 N.E.2d 373, 380 n.19 (Mass. 2000)) (emphasis omitted).  "The factors are not formulaically added together, but rather, are

considered in their totality based on the facts presented." Medici, 239 F. Supp. 3d at 372; see also George Hyman Constr. Co. v. Gateman, 16 F. Supp. 2d 129, 150–58 (D. Mass. 1998) ("The twelve factors serve only to frame the veil-piercing analysis. Overarching the point-by-point analysis are equitable considerations. . . . The factors are weighed, not counted.").

Here, although the issue is close, there is evidence in the record from which a factfinder could conclude that the corporate veil should be pierced, such that O3 Industries would be liable for Solar Seal DE's breach of the lease. Although there was no overlap in ownership between the two entities,[11] a jury could find that Jeremy Ozen, who was a member of O3 Industries, exercised pervasive control over Solar Seal DE as Solar Seal DE's manager; it could also consider significant that Daniel Ozen, a member and president of O3 Industries, signed certain key documents for Solar Seal DE, including the asset purchase agreement through which Solar Seal DE bought Shaw Glass Holdings and the agreement by which Solar Seal DE assumed Shaw Glass Holdings' lease with STAG for Solar Seal DE, [ECF No. 53-2 at 21]. STAG has identified no record evidence of intermingling of assets, see [ECF No. 51 at 18 (discussing only evidence Defendants purportedly "withheld")], or thin capitalization. With respect to corporate formalities and corporate records, Solar Seal DE apparently kept financial records only through April 2022, and Jeremy Ozen used his O3 Industries email address to conduct business on behalf of Solar Seal DE and kept paper records for both entities at his home, [ECF No. 53-2 at 6, 28]; [ECF No. 53-2 at 35]. Solar Seal DE did not pay out any dividends and was functionally

_____

[11] STAG's assertion that Jeremy Ozen was the "managing member" of Solar Seal DE, e.g., [ECF No. 51 at 16], is not supported by the evidence in the record, see [ECF No. 48-3 at 6], and appears to reflect a misunderstanding of Delaware law, which permits limited liability companies to be managed by persons other than its members, see Del. Code Ann. tit. 6, § 18-402.

insolvent when it defaulted on the lease, which, contrary to Defendants' argument, [ECF No. 57 at 12], is the relevant time for assessing insolvency, George Hyman Constr. Co, 16 F. Supp. 2d at 154.  There is no evidence that O3 Industries siphoned off funds from Solar Seal DE, see [ECF No. 51 at 18], or that Solar Seal DE had any nonfunctioning officers or directors or was used for personal transactions of its shareholders, see [id. at 17].  STAG claims that Solar Seal DE's payment of the proceeds of the September 2022 auction of its remaining equipment to "unidentified 'creditors'" constitutes fraud, [ECF No. 51 at 18], but it has not identified any concrete evidence suggesting that Solar Seal DE was established or operated to perpetrate a fraud.

As such, STAG has adduced some evidence regarding at least five of the twelve veil-piercing factors (pervasive control, nonobservance of corporate formalities, absence of corporate records, no payment of dividends, insolvency at the time of the litigated transaction). Considering these factors "in their totality," Medici, 239 F. Supp. 3d at 372, a jury could conclude that O3 Industries exercised pervasive control over Solar Seal DE and used that entity to divert assets from STAG, including by liquidating its assets before defaulting on its lease.  It is true that STAG signed a contract with Solar Seal DE, had the opportunity to conduct diligence regarding that entity, and did so.  See [ECF No. 52 ¶¶ 33–47].  The Court is also mindful that "piercing is the exception, not the rule."  George Hyman Constr. Co., 16 F. Supp. 2d at 157 (quoting Commonwealth Aluminum Corp. v. Baldwin Corp., 980 F. Supp. 598, 605 (D. Mass. 1997)).  Given the fact-intensive and equitable nature of the inquiry, however, the Court cannot determine as a matter of law that the corporate veil should not be pierced.  See Crane v. Green & Freedman Baking Co., 134 F.3d 17, 22 (1st Cir. 1998) ("[V]eil-piercing 'is the sort of determination usually made by a jury because it is so fact specific.'" (quoting Wm. Passalacqua

Builders, Inc. v. Resnick Devs. S., Inc., 933 F.2d 131, 137 (2d Cir. 1991))); Rondout Valley
Cent. Sch. Dist. v. Coneco Corp., 339 F. Supp. 2d 425, 442 (N.D.N.Y. 2004) (noting that
"several courts" applying Massachusetts law on corporate veil-piercing "have denied summary
judgment where material facts were in doubt").  Accordingly, Defendants' motion for summary
judgment on Count III is **<u>DENIED</u>**.

## IV.    CONCLUSION

For the foregoing reasons, STAG's motion for summary judgment on Count I, [ECF No.
42], is **<u>DENIED</u>**, and Defendants' motion for summary judgment, [ECF No. 47], is **<u>GRANTED
IN PART</u>** as to Count II and **<u>DENIED IN PART</u>** as to Count III.

**SO ORDERED.**

September 29, 2025                                      */s/ Allison D. Burroughs*
                                                       ALLISON D. BURROUGHS
                                                       U.S. DISTRICT JUDGE